IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JOHN UNCAPHER,**                                    Case No. 5:17 CV 767

      Plaintiff,

      v.                                              Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                  MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff John Uncapher ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Non-document entry dated April 11, 2017). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in October 2013 (Tr. 196), alleging a disability onset date of October 22, 2004 (Tr. 217). His claims were denied initially and upon reconsideration. (Tr. 91-92, 109-10). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 126). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on February 11, 2016. (Tr. 37). On February 26, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 19-30). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); *see* 20 C.F.R. §§

404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on April 11, 2017. (Doc. 1).

**FACTUAL BACKGROUND**

<u>Personal Background and Testimony</u>

Plaintiff was born in August 1961, making him 52 years old on his application date, and 43 on the alleged onset date. (Tr. 44). Plaintiff had a high-school education. (Tr. 47). He lived at home with his 21 year old son. (Tr. 45). Plaintiff had past work as a manager in an automotive parts center. (Tr. 48). He left the job in 2003 to take care of his mother who had severe emphysema. (Tr. 49).

Plaintiff testified he was able to work until October 19, 2004 – the date he experienced his first panic attack. (Tr. 50). Plaintiff went to the emergency room because he thought he was having a heart attack. *Id*. Plaintiff could not tell when a panic attack was coming, and noted they were "triggered by numerous different things" such as "lighting in a room, sound, [or] a smell". (Tr. 51). He did not deal well with crowds because the first attack happened in a large crowd. *Id*. Plaintiff experienced a panic attack every time he "[went] out into the world", and estimated they lasted "anywhere from a half hour to a few hours". *Id*. Plaintiff estimated he experienced twenty attacks per month on average. (Tr. 52). Symptoms of an attack included nausea, increased heart rate, extremity numbness, blurred vision, and mixed thoughts. *Id*.

Plaintiff was arrested in May of 2012 for cultivating cannabis. (Tr. 55). Plaintiff testified he made oil from the plants and used it to help control his anxiety symptoms instead of taking prescriptions, which he reported had unpleasant side effects. (Tr. 56).

Plaintiff also had trouble sleeping due to a 2012 drive-by shooting at his home. (Tr. 57-58).

Plaintiff had a driver's license, but rarely drove. (Tr. 46). He did not feel comfortable driving because the medication he took to go out in public affected his ability to safely drive. *Id*. He cooked and prepared simple meals at home. (Tr. 58). His son cleaned the home. *Id*. Plaintiff did the yard work, which he described as a "happy, bright spot" in his life. (Tr. 59). He also fixed things around his house, and went to Home Depot "maybe once a year". (Tr. 61). Plaintiff and his son grocery shopped together. *Id*.

Function Report

In December 2013, Plaintiff submitted a Function Report to the Social Security Administration. (Tr. 242-49). In it, Plaintiff noted he was unable to think clearly, experienced memory problems, and could not focus due to medication side effects. (Tr. 242). He could not function around other people and was unable to leave his home without fear. (Tr. 242-43).

When asked why he did not participate in housework, Plaintiff responded he was "too tired" and "just [did not] care anymore!" (Tr. 245). Plaintiff went out to get groceries "every couple of weeks", and how much time he spent in the store depended on "how much time [he] spen[t] in the bathroom stall after taking meds, waiting for them to take effect so that [he could] finish." *Id*.

Relevant Medical Records[1]

In October 2004, Plaintiff went to the emergency room due to chest pain and difficulty breathing. (Tr. 637-43). Plaintiff reported anxiety and confusion. (Tr. 638). He was diagnosed with a panic attack and treated with Ativan. (Tr. 643).

---

1. Plaintiff alleged disability based on anxiety, depression, and panic disorder with agoraphobia. (Doc. 13, at 1). There are also medical records related to physical health problems. Because Plaintiff challenges the ALJ's determination regarding only his mental impairments, the undersigned focuses on evidence related to such.

In March 2005, Plaintiff first saw primary care physician Mark Shivers, M.D. (Tr. 545). Plaintiff reported he was unable to leave his home due to a panic disorder. *Id*. Dr. Shivers prescribed Effexor and Ativan. *Id*.

Plaintiff also sought to establish care at Novo Behavioral Health, Inc. that same month due to ongoing panic attacks. (Tr. 283-84). The intake provider, Linda Baum, M.A., found Plaintiff was motivated to overcome the illness. *Id*. Plaintiff reported his daily activities consisted of caring for his mother and watching television. *Id*. He was unemployed and "reported no interest in pursuing additional training, education, or vocational evaluation or rehabilitation". *Id*. Plaintiff indicated he had difficulty leaving the home, which Ms. Baum noted might impact his ability to attend treatment sessions. (Tr. 285). Plaintiff was in good physical health. (Tr. 284). Ms. Baum found Plaintiff "over controlled and somewhat narcissistic" noting he "does not seek treatment, but instead knowledge about the sudden cause of the panic attacks". (Tr. 287).

Plaintiff saw Dr. Shivers again later that month, reporting he reduced his dosage of Effexor due to constipation and bleeding gums. (Tr. 544). At a follow-up visit with Dr. Shivers later that month, Plaintiff reported he resumed the higher dosage of Effexor and was doing "much better". (Tr. 543). In April 2005, Plaintiff told Dr. Shivers he was "doing well". (Tr. 542).

Plaintiff was discharged from Novo Behavioral Health in May 2005 after attending three sessions. (Tr. 282). Psychologist Michael Hirt, Ph.D., noted Plaintiff withdrew from counseling because he "was not interested in relaxation training or exposure therapy, [and] became upset that no other treatments were offered". *Id*. Further, Dr. Hirt wrote that "[Plaintiff] was not open to therapy as he is reliant on medication and intellectualizes causes of problems." *Id*. Diagnoses were panic disorder with agoraphobia and personality disorder. *Id.*

In July 2005, Plaintiff was seen at Coleman Professional Services ("Coleman") for an intake assessment. (Tr. 297). Plaintiff was angry about being "put on the backburner" by "everyone" and felt the need to "vent" about mental health providers. *Id*. Plaintiff reported agoraphobia and panic attacks that became less intense after medication. *Id*. He described his mood as "sad, low energy, with excessive sleep and napping." (Tr. 298). Plaintiff believed he was "too anxious to work", but wanted to work in the future. (Tr. 301).

Plaintiff met with psychologist Edith Todd, Ph.D., at Coleman for individual counseling three times in September 2005. (Tr. 310). Dr. Todd recommended cognitive behavioral therapy and counseled Plaintiff on "sleep hygiene". (Tr. 311). She made no mental health status findings. (Tr. 314, 317).

Plaintiff saw psychiatrist Michelle Emch, M.D., at Coleman later that month. (Tr. 427). Plaintiff's complaint was being "jerked around for eleven months". *Id*. Plaintiff reported no previous psychiatric history until eleven months prior when he had his first panic attack. *Id*. He reported being bothered by lines and crowds, and he self-isolated. *Id*. He reported the panic attacks improved initially when he began Effexor and Ativan, but recently worsened. *Id*. He described a depressed mood, hopelessness, and poor concentration. *Id*. Dr. Emch believed divorce, loss of employment, and financial stressors contributed to Plaintiff's condition. (Tr. 428). She diagnosed depressive disorder and anxiety disorder. *Id*. Dr. Emch wanted to "rule out panic disorder with agoraphobia". *Id*. She increased Plaintiff's Effexor dosage and encouraged him to continue therapy. (Tr. 429).

In October 2005, Plaintiff told Dr. Emch he stopped taking Trazodone due to side effects, but increased his dosage of Effexor. (Tr. 425). Plaintiff reported two panic attacks in a two week period that occurred when he left his house to shop. *Id*. Plaintiff saw a job counselor weekly but

felt too overwhelmed to go back to work. *Id*. Dr. Emch noted Plaintiff was mildly anxious and irritable. *Id*. Plaintiff's thought content was concentrated on his panic symptoms and perceived inability to work. *Id*.

Plaintiff saw Dr. Emch again later that month. (Tr. 423). He reported slight mood improvement, and noted it was easier to fall asleep. *Id*. He had mild anxiety, but was able to leave the house. *Id*. Dr. Emch observed Plaintiff was depressed, irritable, and frustrated with his treatment. *Id*.

In November 2005, Plaintiff reported better sleep, feeling rested, and a "pretty good" mood. (Tr. 422). Plaintiff reported one panic attack in the previous month, triggered by his disability application. *Id*. On examination, Plaintiff was less irritable, but continued to be "mildly anxious". *Id*. Plaintiff brought product information for "purple primer" with him to the appointment. *Id*. Plaintiff had researched the chemical, and believed his panic attacks started soon after exposure on October 19, 2004. *Id*. Dr. Emch continued Plaintiff's Effexor dose "as [Plaintiff] [wa]s tolerating well and note[d] improvement on this medication." *Id*.

Plaintiff saw Dr. Emch in January 2006 for increased anxiety due to the holidays. (Tr. 420). Plaintiff was feeling "pretty anxious in general". *Id*. He reiterated his concern that toxic chemical exposure caused his anxiety disorder, and Dr. Emch noted Plaintiff appeared nervous. *Id*. Dr. Emch adjusted Plaintiff's medications and recommended he continue with individual and group therapy. *Id*.

Plaintiff saw Dr. Todd for counseling sessions in April and May of 2006. (Tr. 430-33). On examination she found Plaintiff was "less anxious", with a calm affect. (Tr. 431). Plaintiff reported agoraphobic tendencies, but left the house for appointments and shopping. (Tr. 430). Plaintiff

reported he recently had two instances of anxiety that lasted approximately two hours each. (Tr. 433). Dr. Todd recommended Plaintiff go outdoors and stay active. (Tr. 431).

Plaintiff saw Dr. Shivers in January, February, March, and December 2006; and March 2007 for physical issues unrelated to anxiety. (Tr. 532-38). Each time, Dr. Shivers addressed Plaintiff's underlying physical issues and noted "anxiety" in Plaintiff's chart. *See id.*

In October 2007, Plaintiff saw Dr. Shivers for anxiety symptoms. (Tr. 531). Dr. Shivers prescribed Effexor. *Id.*

Plaintiff did not see Dr. Shivers again until April 2008 for an unrelated physical issue. (Tr. 530). A full year later, in April 2009, Plaintiff went to Dr. Shivers for an Effexor refill, and another unrelated physical issue. (Tr. 529).

Plaintiff went to the emergency room in May 2009 to address a laceration on his forehead. (Tr. 344-51). He returned to the emergency room in July 2009 for chest pain resulting from a panic attack. (Tr. 330, 336). Plaintiff stated he was "coming down" from a panic attack after taking Ativan prior to his arrival. (Tr. 336). The emergency room physician diagnosed chest pain (NOS), and prescribed Toradol. (Tr. 337-38).

Plaintiff reported the emergency room visit to Dr. Shivers later in July 2009. (Tr. 527). Dr. Shivers noted anxiety and atypical chest pain, and increased Plaintiff's Effexor dosage. *Id.* In August 2009, Plaintiff asked Dr. Shivers for an Effexor XR prescription because he could not tolerate the generic equivalent. (Tr. 526).

Plaintiff did not see Dr. Shivers again until August and October 2011, for physical issues unrelated to anxiety. (Tr. 521-23). In his treatment notes from each visit, Dr. Shivers noted Plaintiff's anxiety history, and refilled the Effexor prescription without further comment. *See id.*

In December 2012, Plaintiff went to Community Mental Health Center for an initial screening. (Tr. 403). Plaintiff reported he had warrants out for his arrest for growing marijuana. (Tr. 401). Plaintiff also stated he was addicted to Effexor, and experienced severe withdrawal symptoms when he attempted to stop. (Tr. 403). The following day, Plaintiff saw counselor William Russell, P.C., for an assessment. (Tr. 355). Plaintiff detailed a history of anxiety and depression, with panic attacks. *Id*. He reported stress surrounding two drive-by shootings at his home. *Id*. Plaintiff admitted being addicted to Effexor. *Id*. Plaintiff further admitted to cultivating marijuana in his home, but stated he only "juiced" it by blending it with carrot or apple juice in a blender; he did not smoke. *Id*. He also reiterated his concern that "purple primer" exposure caused his panic attacks. *Id*. Plaintiff was tearful through his assessment and expressed shame for his substance abuse issues. *Id*. On examination, Plaintiff was friendly, talkative, and cooperative, but mistrustful and preoccupied. (Tr. 367-68).

Plaintiff saw Cheryl Stahl, a substance abuse counselor at Townhall II in ten court-ordered sessions from June to July 2013. (Tr. 416, 603, 610). Plaintiff was referred for an assessment and treatment related to a marijuana cultivation charge. (Tr. 736). On assessment, Plaintiff had visible anxiety symptoms such as shaking and minimal eye contact. *Id*. Ms. Stahl noted all of his other anxiety symptoms were self-reported, including agoraphobia and difficulty managing daily tasks. *Id*. Ms. Stahl concluded Plaintiff met the diagnostic criteria for cannabis dependence. (Tr. 737). She found Plaintiff anxious, but cooperative with a clear thought process. *Id*. Ms. Stahl described Plaintiff as a "pretty happy person, usually pretty easy to get along with". (Tr. 745). She found Plaintiff "continued efforts to try to function despite panic", and that he needed "to have a more productive life". (Tr. 761).

In Plaintiff's discharge paperwork from Townhall II dated July 26, 2013, Ms. Stahl noted "[Plaintiff's] panic disorder remained an issue throughout treatment." (Tr. 755). Ms. Stahl found, "toward the end of treatment [Plaintiff] appeared to be doing better with this by weaning himself off his medication", but "once he was off he had several severe panic attacks and was put back on the medication." *Id*. Plaintiff "realized he needed to be back on his medication and became depressed". (Tr. 756). Plaintiff was discharged with staff approval as he completed the recommended services for his legal issues. (Tr. 757). Plaintiff told Ms. Stahl he planned to stay with Townhall II for additional treatment, but only attended one session and never returned. *Id*.

In January 2015, Plaintiff saw Dr. Shivers for increased anxiety. (Tr. 516). Dr. Shivers increased Plaintiff's Effexor dosage. *Id*.

In October 2015, Plaintiff told Dr. Shivers that he was "essentially home bound" due to agoraphobia. (Tr. 777). Dr. Shivers provided medication refills. *Id*.

In November 2015, Plaintiff saw Mr. Robert Parsons, CNP. (Tr. 785). Plaintiff reported "significant anxiety, periods of depression, and frequent panic attacks". *Id*. Plaintiff stated the symptoms began "approximately ten years ago". *Id*. Mr. Parsons found Plaintiff was "somewhat anxious" with "fair" behavior and insight. *Id*.

Medical Opinion Evidence

*Treating Sources*

*Dr. Shivers*

In October 2015, Dr. Shivers completed a Physical Medical Source Statement. (Tr. 772-75). He had treated Plaintiff since 2003, and diagnosed him with depression, anxiety, and hypertension with a "poor to fair" prognosis. (Tr. 772). Dr. Shivers noted Plaintiff had chest pain associated with panic attacks, and was prescribed Effexor and Ativan. *Id*.

Dr. Shivers opined Plaintiff could only walk one to two city blocks – not due to pain, but due to Plaintiff's fear of crowds. (Tr. 773). Plaintiff had no limitations on sitting or standing. *Id*. Dr. Shivers opined Plaintiff needed a job that permitted shifting positions due to anxiety. *Id*. He would need fifteen minute breaks every two to three hours due to chronic fatigue and pain. *Id*.

Plaintiff could occasionally lift up to twenty pounds, and rarely lift fifty. (Tr. 774). He could occasionally twist, stoop, crouch, bend, and climb ladders and stairs. *Id*. Dr. Shivers opined Plaintiff had significant limitations with reaching, handling, and fingering due to anxiety. *Id*. He was likely to be "off task" 25% or more of a workday. (Tr. 775). Dr. Shivers found Plaintiff incapable of even "low stress" work due to severe anxiety, and estimated he would be absent from work four or more days per month. *Id*.

### Ms. Stahl

Ms. Stahl completed a Mental Status Questionnaire in January of 2014 where she offered an opinion on Plaintiff's work related limitations. *See* Tr. 416-18. At the time she issued the opinion, Ms. Stahl had seen the Plaintiff five times. *See* Tr. 732, 736, 548, 574, 577. Ms. Stahl opined Plaintiff's flow of conversation, speech, mood, affect, cognitive functioning, and judgment were within normal limits. (Tr. 416). She opined Plaintiff's anxiety was "moderate to severe" with "debilitating panic attacks". *Id*. She opined Plaintiff's panic attacks prevented him from engaging in activities outside of his "comfort zone". (Tr. 417). Further, Ms. Stahl noted Plaintiff was referred to her for substance abuse issues and he appeared to be using cannabis to help with his anxiety. (Tr. 416). In February 2014, Ms. Stahl completed a Daily Activities Questionnaire. (Tr. 258). She noted Plaintiff lived independently with his adult son, but had difficulty leaving his "comfort zone" due to panic attacks. *Id*. Ms. Stahl noted Plaintiff claimed he was unable to work due to severe panic in unfamiliar social situations. *Id*.

*Examining Sources*

*Mr. Parsons*

In December 2015, Mr. Parsons, completed a Mental Impairment Questionnaire. (Tr. 787-88). He examined Plaintiff on one occasion in November 2015. (Tr. 787). He diagnosed Plaintiff with panic disorder, and PTSD. *Id*. Mr. Parsons found Plaintiff also had chronic depression, severe panic attacks, and anxiety. *Id*. Mr. Parsons opined Plaintiff had a poor prognosis and was "unable to work in any capacity". (Tr. 787-88).

Mr. Parsons opined Plaintiff was "unable to meet competitive standards"[2] in his ability to carry out short or detailed instructions; maintain attention and concentration; sustain an ordinary routine without supervision; work in coordination or in proximity to others; perform at a consistent pace; remember locations or procedures; get along with coworkers; maintain socially appropriate behavior; set goals; be aware of workplace hazards; or respond to changes in a work setting. *Id*.

Plaintiff had "no useful ability to function"[3] in his ability to understand and remember detailed instructions; interact with the public; perform on a schedule; be punctual; or complete a normal workday without interruptions from psychologically based symptoms. *Id*.

Mr. Parsons also completed a Physical and Mental Abilities Assessment for the Portage County Department of Job and Family Services in December 2015. *See* Tr. 789. Mr. Parsons opined Plaintiff could remember work locations and procedures, but could not maintain

---

2. The check-box form defines a person who is *unable to meet competitive standards* as one who "cannot satisfactorily perform this activity independently, appropriately, effectively, and on a sustained basis in a regular work setting." (Tr. 787) (emphasis in original).

3. The same form describes a person with *no useful ability to function* as someone who has an "extreme limitation. . . [and] cannot perform this activity in a regular work setting." (Tr. 787) (emphasis in original).

concentration; sustain a routine; carry out instructions; perform on a schedule; or interact with the public. *Id*. He concluded Plaintiff was "unable to work in any capacity at this time". *Id*.

### Dr. Konieczny

In November 2015, Plaintiff underwent a psychological consultative examination with state agency physician, Dr. Konieczny. (Tr. 779-81). On examination, Dr. Konieczny found Plaintiff was "anxious", but otherwise cooperative and responsive with adequate motivation and participation throughout the evaluation. (Tr. 780). Plaintiff reported difficulty sleeping, lack of energy, and no social interaction with others. *Id*. Dr. Konieczny diagnosed panic disorder, agoraphobia, and other unspecified depressive disorder. (Tr. 780-81). He opined Plaintiff's ability to understand, remember, and carry out instructions was "likely to be somewhat sporadic and inconsistent" due to Plaintiff's "heightened anxiety". (Tr. 781) (finding "moderate" limitations in this area). Dr. Konieczny opined Plaintiff's attention and concentration to single and multi-step tasks would also be "sporadic and inconsistent" during periods of "heightened anxiety". *Id*. He opined Plaintiff would have "significantly diminished tolerance for frustration and diminished coping skills which would impact his ability to respond to even simple supervision and interpersonal situations in the work setting." *Id*.

### Reviewing Physicians

In February 2014, Bonnie Katz, Ph.D., reviewed the record and found insufficient evidence to substantiate the presence of a mental disorder. (Tr. 80). She noted Plaintiff was uncooperative, and refused to attend a consultative examination that was more than twenty minutes away from his home. *Id*. Similarly, in February 2014, Teresita Cruz, M.D., reviewed the evidence of record

and found no medically determinable physical impairment. (Tr. 79, 82). She also noted Plaintiff refused to participate in an exam. (Tr. 90).

In May 2014, Abraham Mikalov, M.D., found Plaintiff had no physical impairments and there was insufficient evidence to support a claim. (Tr. 97, 100). Again, he noted Plaintiff refused to speak with representatives and refused to provide requested medical records. (Tr. 97). In May 2014, Paul Tangeman, Ph.D., also reviewed the evidence of record and found no medically determinable mental impairment. (Tr. 98). He also noted Plaintiff refused to participate in an exam. *Id*.

<u>VE Testimony</u>

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 68-74. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was physically and mentally limited in the way the ALJ determined Plaintiff was. (Tr. 69-70). The VE opined such an individual could not perform Plaintiff's past work, but could perform other jobs such as a cleaner, hand packer, or laundry laborer. (Tr. 70).

<u>ALJ Decision</u>

The ALJ made the following findings of fact and conclusions of law in his February 26, 2016 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since October 22, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: depressive disorder, posttraumatic stress disorder (PTSD), panic disorder with agoraphobia, and anxiety medication addition/cannabis dependence (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: never working around unprotected heights, moving mechanical parts, or operating a motor vehicle; limited to the performance of simple, routine, and repetitive tasks, but not at a production rate pace, such as assembly line work; and he can have occasional contact with supervisors, the public, and co-workers.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August 22, 1961 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 22, 2004, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-29).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ failed to appropriately evaluate the medical opinion evidence. (Doc. 13, at 1). Specifically, he asserts the ALJ erred in the weight he assigned to the opinions of Drs. Shivers and Konieczny, Mr. Parsons, and Ms. Stahl. *Id*. at 11-13. The Commissioner responds that the ALJ's decision is supported by substantial evidence and should be affirmed. For the reasons discussed below, the undersigned affirms the decision of the Commissioner.

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers,* 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004))[4].

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 514 (6th Cir. 2010).

When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

The regulations also provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). As to non-treating medical sources, the regulations require ALJs to weigh their opinions "based on the examining relationship, (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed

---

4. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

controlling." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)). Although the ALJ need not provided "good reasons" for the weight assigned to non-treating source opinion, the findings made must still be supported by substantial evidence.

*Dr. Shivers*

Dr. Shivers is a treating source as defined by the regulations due to his ongoing treatment relationship with Plaintiff. *See* 20 C.F.R. §§ 404.1502, 416.902. As such, his opinion is entitled to controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques; and is not inconsistent with other substantial evidence in the case record. *Rogers,* 486 F.3d at 242 (citing *Wilson,* 378 F.3d at 544). In his analysis, the ALJ summarized Dr. Shivers's opinion and gave reasons for the weight assigned:

> No controlling weight is given to the medical source statement of Dr. Shivers (Exhibit 16F). Dr. Shivers determined that the claimant has difficulty working due to anxiety, he would miss more than four days of work per month due to his impairments, he would be off task more than 25 percent of the workday, and he is incapable of performing even "low stress" work. These extreme limitations are inconsistent with the medical record as a whole, including the claimant's ability to function in public as described above, and his history of extensive substance use and medical non-compliance that has exacerbated his mental health symptoms. In addition, Dr. Shivers provided very little supporting evidence aside from listing the claimant's diagnoses and largely restating his subjective allegations, which are not fully credible. Finally, Dr. Shivers specializes in family medicine, and he is therefore not fully qualified to opine on the claimant's mental functioning. Therefore, I afford little weight to this opinion.

(Tr. 27).

Here, the ALJ gave several reasons why he did not assign controlling weight to the medical source statement provided by Dr. Shivers, and good reasons for assigning the opinion "little weight". First, he found that it was inconsistent with the medical records as a whole, including Plaintiff's history of substance abuse and medical non-compliance which exacerbated his symptoms. *Id*. For example, Dr. Shivers opined Plaintiff could not maintain gainful employment

due to his difficulty being outside of his home (Tr. 775), yet Plaintiff testified he spoke to his neighbors (Tr. 60), fixed a neighbor's car *id.*, went grocery shopping with his son (Tr. 59), went to Home Depot (Tr. 61), attended all of his court-ordered appointments (Tr. 54, 610), and bought a cannabis plant from a neighbor (Tr. 62). These inconsistencies suggest Dr. Shivers was relying on Plaintiff's subjective reports of severe panic attacks and inability to function outside of his home. The ALJ recognized these inconsistencies and assigned Dr. Shivers's opinion little weight as a result. The undersigned finds no error in the ALJ's evaluation of his opinion.

Next, the ALJ found Dr. Shivers provided very little supporting evidence for his opinion aside from listing Plaintiff's diagnosis and restating his subjective symptoms. (Tr. 27). It is well-established that an ALJ is not required to accept a physician's opinion based solely on a claimant's self-reported symptoms. *See* 20 C.F.R. §§ 404.1527(b); 416.927(b); *Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555, 564 (6th Cir. 2014); *Bell v. Barnhart*, 148 F. App'x 227, 285 (6th Cir. 2005) (declining to give weight to a doctor's opinion supported only by the claimant's self-reported symptoms). Here, although Dr. Shivers' treatment records consistently list "anxiety" as a diagnosis, there are virtually no mental status findings on examination to support the diagnosis or the severe functional limitations assigned. *See* Tr. 412 (listing "depression/anxiety" as a diagnosis on a "health maintenance" follow-up, but also noting Plaintiff "voices no further complaints", and providing no mental status examination findings); Tr. 413 (noting Plaintiff was seen for a cough, listing "depression" diagnosis, but providing no mental status examination findings); Tr. 517 (noting Plaintiff was seen for cholesterol, listing "anxiety" diagnosis, but providing no mental status examination findings). Further, many of Plaintiff's visits with Dr. Shivers involved physical ailments unrelated to Plaintiff's anxiety. (Tr. 518-21, 525, 777). The only clue in the medical records as to an anxiety issue is found in Plaintiff's new patient consultation with Dr. Shivers

where Plaintiff reported he was diagnosed with "panic disorder" four months prior, and was unable to leave his home. (Tr. 545). The subsequent medical records show Dr. Shivers was monitoring Plaintiff's Effexor use and providing refills based on Plaintiff's reported symptoms, but do not reflect mental status exam findings, nor any elaboration regarding exactly what symptoms Plaintiff reported that led to the "anxiety" diagnosis. *See* Tr. 526-27.

Finally, as the ALJ points out, Dr. Shivers is not a professional that specializes in mental health care. (Tr. 27); 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) (the Social Security Commission generally gives more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.).

The ALJ considered the regulatory factors of consistency, supportability, and specialization in determining the weight to assign to Dr. Shivers's opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). The Sixth Circuit has held an ALJ may give the required "good reasons" by challenging the supportability and consistency of the treating physician's opinion in an "indirect but clear way". *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010); *see also Henke v. Astrue*, 498 F. App'x 636, 640, n.3 (7th Cir. 2012) (addressing an opinion's supportability and consistency with the record as a whole is sufficient); *Benneman v. Comm'r of Soc. Sec.*, 2012 WL 5384974, at *1 (N.D. Ohio).

The reasons provided are supported by substantial evidence, and are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Ealy,* 594 F.3d at 514. The undersigned therefore finds the ALJ provided the required "good reasons" for discounting Dr. Shivers's opinion.

*Mr. Parsons*[5]

Plaintiff contends the ALJ improperly dismissed the opinion of Mr. Parsons. First, contrary to Plaintiff's assertion, Mr. Parsons is not a doctor, and therefore not an acceptable medical source under the regulations. An "acceptable medical source" includes "licensed physicians" and "licensed or certified psychologists." 20 C.F.R. §§ 404.1513(a)(2); 416.913(a)(2). Evidence from those who are "not acceptable medical sources" or "other sources", including nurse practitioners, "are important and should be evaluated with key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-03p, 2006 WL 2329939, at *2. Interpreting SSR 06-03p, the Sixth Circuit found that "[o]pinions from non-medical sources who have seen the [Plaintiff] in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion in with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Further, an ALJ is not required to give a non-acceptable medical source controlling weight, or give "good reasons" for rejecting their opinions. *Smith v. Comm'r Soc. Sec.*, 482 F.3d 873,876 (6th Cir. 2007)).

In his analysis, the ALJ summarized the opinion of Mr. Parsons and gave reasons for the weight assigned:

> No controlling weight is given to the opinion of Dr. Parsons completed for the Portage County Department of Job and Family Services (Exhibit 21F). Dr. Parsons determined that the claimant is unable to function in any work environment. The opinion that the claimant is unable to work is a determination that is reserved for the Commissioner, and this is not a specific statement of functional abilities (20 CFR 404.1527(e), 416.927(e), and SSR 96-5p). In addition, this opinion is inconsistent with the record as a whole for the reasons listed above, and Dr. Parsons

5. In his opinion, the ALJ incorrectly refers to Robert Parsons as "Dr. Parsons", when in fact, he is a nurse practitioner. *Compare* Tr. 27; *with* Tr. 789. Plaintiff's brief makes the same error. (Doc. 13, at 19). As a nurse practitioner, Mr. Parsons is not an acceptable medical source for claims filed prior to March 27, 2017. *See* 20 C.F.R. §§ 404.1502; 419.902.

provided very little supporting evidence or documentation for his extreme limitations. Finally, Dr. Parsons completed this assessment for Job and Family Services, not for Social Security disability benefits, which reduces its relevancy to this decision. Therefore, I give little weight to this opinion.

No controlling weight is given to the medical source statement of Dr. Parsons that was completed in December 2015 (Exhibit 20F). Dr. Parsons determined that the claimant cannot work in any capacity, and he concluded that he is unable to meet competitive standards in almost all mental-related work areas. These opinions are inconsistent with the medical record for the reasons listed above, and the opinion that the claimant cannot work is reserved for the Commissioner. In addition, like Dr. Shivers, Dr. Parsons provided very little supporting evidence for these extreme limitations aside from generally restating the claimant's subjective allegations and diagnoses. Furthermore, Dr. Shivers [sic] has a limited treating relationship with the claimant, indicating that he only began seeing him in November of 2015. Finally Dr. Parsons was unable to opine on how much the claimant would be off task during an 8-hour workday. Therefore, I assign little weight to this opinion.

(Tr. 27-28).

Here, the ALJ gave several reasons for assigning "little weight" to Mr. Parsons' opinions. First, the ALJ chose to discount the opinion Mr. Parsons issued for the Department of Job and Family Services. (Tr. 27). The ALJ found the opinion was presented to another agency and not otherwise relevant to the Social Security decision here. *Id*. Additionally, the ALJ gave no weight to Mr. Parsons's conclusory opinion that Plaintiff was unable to work. (Tr. 38-39). This reason is firmly rooted in statute and therefore wholly appropriate. *See* 20 C.F.R. §§ 404.1527(d)(3); 416.927(d)(3) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section."); *see also Amir v. Comm'r of Soc. Sec.*, 705 F. App'x 443, 448 (6th Cir. 2017) ( "[A] determination concerning whether a claimant is able to work is not a medical opinion, but is instead a legal conclusion on an issue reserved for the Commissioner.").

Regarding Mr. Parsons's December 2015 opinion, the ALJ again appropriately found Mr. Parsons's determination Plaintiff was unable to work was one reserved exclusively for the

Commissioner. *See Amir, 706* F. App'x at 448; 20 C.F.R. §§ 404.1527(d)(3); 416.927(d)(3).

Further, the ALJ pointed to a lack of supporting evidence for the extreme limitations assigned due

to the limited treatment relationship between Plaintiff and Mr. Parsons. (Tr. 28). Mr. Parsons

examined Plaintiff one time, and merely reiterated Plaintiff's subjective symptoms in his

evaluation. *See* Tr. 785 ("[Plaintiff] complains of significant anxiety, periods of depression and

frequent panic attacks. He states these symptoms began approximately 10 years ago."). As noted

above, supportability is an appropriate reason an ALJ may give to discount the opinion of a medical

provider, and an ALJ is never required to accept a provider's opinion based solely on a claimant's

self-reported symptoms *See* 20 C.F.R. §§ 404.1527(b); 416.927(b); *Griffith*, 582 F. App'x at 564.

The undersigned therefore finds the ALJ's reasons for discounting the opinions of Mr.

Parsons are supported by substantial evidence.

*Ms. Stahl*

Ms. Stahl, Plaintiff's court-ordered substance abuse counselor, is also not an acceptable

medical source under the regulations. As noted above, an "acceptable medical source" includes

"licensed physicians" and "licensed or certified psychologists." 20 C.F.R. §§ 404.1513(a)(2);

416.913(a)(2). Evidence from those who are "not acceptable medical sources" or "other sources",

including counselors, "are important and should be evaluated with key issues such as impairment

severity and functional effects, along with other relevant evidence in the file." SSR 06-03, 2006

WL 2329939, at *2.

Here, the ALJ provided several reasons for assigning "little weight" to Ms. Stahl's medical

source opinion:

> No controlling weight is given to the opinion of Ms. Cheryl Stahl, the claimant's
> substance abuse counselor (Exhibit 6F). Ms. Stahl determined that the claimant
> cannot function outside of his home and "comfort zone" due to panic attacks. Ms.
> Stahl is not a psychologist or psychiatrist, and she is therefore not an acceptable

medical source to opine on the claimant's mental functioning or abilities. In addition, Ms. Stahl could not even say how the claimant would respond to workplace pressures because it is outside the scope of her practice, and she concluded that his abilities in remembering, understanding, and following directions, and maintaining attention are normal (a finding that is internally inconsistent). Finally, Ms. Stahl's statement that the claimant cannot function outside of his home is inconsistent with the record as a whole, including his testimony that he talks to his neighbors, bought a cannabis plant from a neighbor, fixed a neighbor's car, goes grocery shopping with his son, and attended court-ordered AA meetings for one year (hearing testimony). Therefore, I give little weight to this opinion.

(Tr. 28).

First, the ALJ appropriately pointed out Ms. Stahl is not qualified to render an opinion on Plaintiff's mental health or functioning. *Id.* Ms. Stahl is not a psychiatrist or psychologist. *Id.*; *see* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) (the Social Security Administration generally gives more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist).

Next, the ALJ noted inconsistencies between Ms. Stahl's extreme limitations and Plaintiff's testimony regarding his daily activities. (Tr. 28) (citing Tr. 415-17). For example, Ms. Stahl opined Plaintiff could not function outside of his home, or his "comfort zone" (Tr. 417), yet Plaintiff testified he spoke to his neighbors (Tr. 60), fixed a neighbor's car *id.*, went grocery shopping with his son (Tr. 59), went to Home Depot (Tr. 61), attended all of his court-ordered appointments (Tr. 54, 610), and bought a cannabis plant from a neighbor (Tr. 62). These inconsistencies suggest Ms. Stahl relied on Plaintiff's subjective reports of severe panic attacks and inability to function outside of his home. *See* 20 C.F.R. §§ 404.1527(b); 416.927(b) (an ALJ is not required to accept a physician's opinion based solely on a claimant's self-reported symptoms.). In fact, Ms. Stahl found Plaintiff anxious, but cooperative with a clear thought process. (Tr. 737). She described Plaintiff as a "pretty happy person, usually pretty easy to get

along with". (Tr. 745). The ALJ recognized these inconsistencies and assigned Ms. Stahl's opinion little weight as a result. The undersigned finds no error in the ALJ's evaluation of this opinion.

*Dr. Konieczny*

Finally, Plaintiff argues the ALJ incorrectly weighed Dr. Konieczny's opinion by failing to recognize his specialty as a psychologist, which would thereby entitle his opinion to greater weight. (Doc. 13, at 15). Plaintiff is correct that the Social Security Administration generally gives more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5). However, as outlined below, there are many factors an ALJ must consider, and the fact that Dr. Konieczny is a psychologist does not automatically entitle his opinion to controlling weight.

As an initial matter, an examining, but not treating, source is one who has examined Plaintiff, but did not have an ongoing treatment relationship. 20 C.F.R. §§ 404.1527 and 404.1502; SSR 96-2, 1996 WL 374188 at *1. This includes state agency physicians whose opinions must be considered by the ALJ. *Id*. Consultative examiners are evaluated under the same statutory factors as treating physicians, however, the ALJ is not required to provide "good reasons" for the weight given. *Warner v. Comm'r Soc. Sec.*, 375 F.3d at 387, 391 (6th Cir. 2004); *Smith*, 482 F.3d at 876 (holding "the SSA requires ALJs to give reasons for only treating source" opinions). Here, Dr. Konieczny performed a one-time psychological assessment of Plaintiff on November 30, 2015. (Tr. 779-82).

The ALJ explained the reasons for assigning "little weight" to Dr. Konieczny's opinion:

As for the opinion evidence, little weight is given to the consultative examination assessment of Dr. Konieczny (Exhibit 17F). Dr. Konieczny determined that the claimant has moderate limitations in understanding, remembering, and carrying out instructions, he would have difficulty maintaining focus and persistence on even simple, multi-step tasks, he has significantly diminished tolerance for frustration and coping skills, which would impact his ability to respond to even simple

interactions with others, and he would have difficulty responding to even simple workplace stresses and pressures. These opinions are largely inconsistent with the medical record as a whole, including the claimant's varied activities of daily living and public functioning that indicates a greater level of functioning than alleged at the hearing. Moreover these opinions are internally inconsistent with the claimant's mostly mild mental status exam findings during this consultative assessment, without evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues (Exhibit 17F, pg. 3-4).

(Tr. 27).

Here, the ALJ found the limitations assigned by Dr. Konieczny were largely inconsistent with the record as a whole, including Plaintiff's self-reported daily activities. *Id.* This is supported by the record. As noted above, Plaintiff testified he spoke to his neighbors (Tr. 60), fixed a neighbor's car *id.*, went grocery shopping with his son (Tr. 59), went to Home Depot (Tr. 61), attended all of his court-ordered appointments (Tr. 54, 610), and bought a cannabis plant from a neighbor (Tr. 62). These activities are inconsistent with Dr. Konieczny's opinion that Plaintiff would be unable to interact with others. (Tr. 781) ("[Plaintiff] would have significantly diminished tolerance for frustration and diminished coping skills which would impact his ability to respond to even simple supervision and interpersonal situations in the work setting."). The ALJ further pointed out that the limitations to which Dr. Konieczny opined were inconsistent with his own mild mental status exam findings. (Tr. 27). This is supported by the record. *See* Tr. 781 ("[Plaintiff] showed no deficits in his awareness of rules of social judgment and conformity", and "he would be capable in the managing [of] his own daily activities and of handling his financial affairs without assistance").

As noted above, consistency and supportability are appropriate factors an ALJ to consider when considering an opinion of a non-treating medical source. *See* 20 C.F.R §§ 404.1527(d), 416.927(d). Here, the ALJ's decision that Dr. Konieczny's opinion is internally inconsistent and

unsupported by the record is supported by substantial evidence. As such, the undersigned finds no error in the ALJ's decision to discount the opinion of Dr. Konieczny.

Here, the ALJ did not find Plaintiff had *no* mental limitations, rather, rather they were less substantial than opined in certain medical source opinions. And, although Plaintiff can point to evidence suggesting a contrary conclusion, this Court must affirm even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477.

In sum, the undersigned finds the ALJ gave good reasons for the weight he assigned to the opinions of Doctor Shivers, Mr. Parsons, Ms. Stahl, and Dr. Konieczny. Accordingly, the undersigned affirms the Commissioner's decision.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI is supported by substantial evidence and affirms that decision.

                              s/James R. Knepp II
                              United States Magistrate Judge